**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,   )<br>                               )<br>                 Plaintiff,    )<br>                               )<br> v.                            )<br>                               )<br> STEVEN J. DENSON,             )<br>                               )<br>                 Defendant.    )<br> _____) | **CRIMINAL ACTION**<br><br>No. 13-10111 |

**MEMORANDUM AND ORDER**

This matter is before the court on:

> Defendant's Motion to Suppress (Doc. 13);
> Government's Response (Doc. 15); and
> Defendant's Supplemental Memorandum (Doc. 21).

The court held an evidentiary hearing on the motion on September 5, 2013, and took the matter under advisement.

**I. Facts.**

The court finds the following facts from the evidence presented. Defendant Steven J. Denson was convicted by the State of Kansas on two counts of aggravated robbery and was sentenced to a term of confinement. He was paroled from Kansas Department of Corrections' (KDOC) custody on May 3, 2012.

Defendant failed to report as directed by his parole officer, causing his parole officer to request an "absconder warrant" from the KDOC Secretary of Corrections.[1] The Secretary, as authorized by K.S.A. § 75-5217, issued a warrant on November 7, 2012. The warrant directed

---

[1] An absconder warrant is issued under the authority of the Secretary of Corrections for an offender whose whereabouts are unknown. KDOC Internal Management Policies and Procedures (IMPP) §14-131.

any officer who was authorized by Kansas law to make arrests to arrest defendant and to take him into custody so he could be returned to the KDOC and brought before the Kansas Parole Board. Section 75-5217(g) provides that law enforcement officers shall execute warrants issued by the Secretary in the same manner as any arrest warrant.

KDOC Special Enforcement Officer Brandon Bansemer, whose duties include finding and apprehending KDOC absconders, was assigned the case. Bansemer knew that in addition to the absconder warrant defendant had outstanding bench warrants for other matters. Bansemer investigated defendant's whereabouts in November 2012 but exhausted all available leads. In February 2013, he discovered through an additional check with Westar utility company that defendant was listed as the primary account holder on a recently activated account at 1645 N. Hillside in Wichita. The account was activated on February 5, 2013. Bansemer also found a Keyionna Miller listed on the account and determined that she had an outstanding warrant for a probation violation.

Bansemer contacted U.S. Deputy Marshal Joshua Moff in Wichita, who was in charge of the local U.S. Marshals Fugitive Task Force. The task force assisted KDOC agents in apprehending KDOC fugitives. Bansemer arranged for two marshals and two other officers to meet with him in the vicinity of 1645 N. Hillside on the morning of February 27, 2013, to attempt to execute the KDOC arrest warrant. Bansemer decided upon an early morning operation – about 8:30 a.m. – to increase the odds that defendant would be at the residence. His investigation indicated defendant had no employment and no registered vehicle.

Bansemer and another officer set up surveillance on the back door

of the residence, which was part of a duplex, and observed for about 20 minutes. No one entered or left the residence in that time. Bansemer eventually went around to the front of the residence, and as he did so he noticed what looked like fairly recent footprints in the snow leading from the back door to the front of the house. He checked the house's electric meter and saw that it was spinning very rapidly, indicating to him there was likely someone inside using a significant amount of electricity. There was a van parked in the front of the residence. It was snow-packed, indicating it had been stationary for some time. The van was registered to someone other than defendant.

There were several glass panes in the front door of the residence and officers at the front door could see couches, an open suitcase, and other items inside the residence. The agents knocked on the front door and announced their presence as police officers. They continued knocking for several minutes but got no response and saw no motion. A neighbor came out of the adjoining duplex unit and left the area. After continued knocking produced no results, Deputy Moff decided to go back to his car to get a "Ranger," a doppler radar device that could indicate the presence of persons inside the house. He returned a few minutes later and used the device.[2]

The agents knocked and announced their presence again – louder this time – and in doing so knocked a piece of plywood off the door that was nailed over a missing glass pane. After agents yelled in through the opening and still got no response, they reached through

---

[2] The device indicated there was someone breathing in the house. The Government, citing <u>Kyllo v. United States</u>, 533 U.S. 27 (2001), disclaims any reliance upon this information to support a reasonable belief that defendant was in the house. (Doc. 15 at 2, n.1).

-3-

the empty window pane and were able to unlock the door. They entered the house and quickly saw an individual in bed in one of the house's two bedrooms. They yelled at the man – whom agents eventually recognized as Steven Denson – to get out of bed and show his hands. Defendant did so and was compliant with the officers' directives as they moved to put handcuffs on him. They cleared the area around him for weapons and moved him to a couch in the residence.

The agents knew that defendant, who had some history of violent offenses, was reported to be a member of a local street gang. They also knew that Keyionna Miller was listed on the residence and that she had a warrant for her arrest. Based on a reasonable belief and concern that others who could pose a danger were present in the house, officers went through the each room of the house to determine who, if anyone, was present. Officers started with defendant's bedroom and fanned out to other rooms, including the only other bedroom in the house. Deputy Moff entered this other bedroom. Although defendant disputed the timing and sequence of these events, the credible testimony was that Moff entered the other bedroom within a minute or two of when the officers arrested defendant and placed him on a couch in the living room.

Moff could see when he entered the spare bedroom that it was completely void of furniture. He saw what appeared to be a closet and went to look inside.[3] He stuck his head in to view the entire closet

---

[3] There was some conflicting testimony as to whether the closet door was initially open or closed. The court finds it was likely closed but, in either event, it was reasonable for Moff to stick his head in the closet to make sure no one was in there. The interior of the closet was wider than the closet doorway and could have obscured a person off to the side of the closet entrance. The officer could not

-4-

and when he did so he saw two long guns leaning up against the closet wall. Moff summoned another officer to secure the weapons as he and other officers completed a sweep of the residence.

Because the officers believed defendant was a convicted felon in constructive possession of firearms, they placed a call to ATF Agent Neal Tierney. Tierney told them he was on his way and arrived about 20 minutes later. After he examined the guns, he said he would contact the U.S. Attorney's office to see if it wanted to prosecute. The agents then left the house and transported defendant to the Sedgwick County jail. Tierney went to the jail a few hours later to interview defendant. He gave defendant a written form explaining his Miranda rights and reviewed the form with defendant. Defendant said he understood his rights, signed the waiver of rights form, and answered some of Tierney's questions.

**II. Discussion**

Defendant contends the officers' initial entry into the house was unlawful because they did not have reasonable suspicion that he was present in the house. (Doc. 13 at 3). Even if they had reasonable suspicion, he argues the officers engaged in an unlawful and general search of the residence after they entered. He contends the officers searched the closet and found the guns some ten to fifteen minutes after he was arrested, not during an initial sweep of the house. Defendant argues that the search was unreasonable and that any evidence resulting from it, including the firearms and his later statements to officers, should be suppressed.

---

have ascertained that no one was in the closet without making a full visual examination.

Defendant does not dispute that the officers had a valid arrest-and-detain warrant issued by the Secretary of Corrections in accordance with Kansas law. Rather, he argues they lacked a reasonable belief that he was present in the house and therefore were not justified in entering the house under the standards of Payton v. New York, 445 U.S. 573 (1980). (See Doc. 13 at 3-4). In Payton, the Supreme Court held that a judicial arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.[4] Payton requires that officers have a reasonable belief that the arrestee lives at the residence and is within the residence at the time of entry. See United States v. Gay, 240 F.3d 1222, 1226 (10th Cir. 2001).

The government met its burden of showing such a reasonable belief. Agent Bansemer's information that defendant recently activated a utility account and was listed as the primary account holder for this residence provided reasonable grounds to believe defendant lived at this residence.[5] The combination of facts known to the officers

---

[4]Defendant does not argue that a non-judicial arrest warrant lacks the same implied authority to enter a residence recognized in Payton. And given the relative interests involved, including defendant's lesser expectation of privacy as a parolee and the State's substantial interest in apprehending absconders from parole, the court finds that the KDOC warrant carried at least the same implied authority to enter a residence as was recognized by Payton. Cf. United States v. Delay, 2003 WL 22327117 (D. Kan., Sept. 30, 2003) (police officers lawfully entered defendant's motel room to execute parole arrest and detain order).

[5] The fact that Miller was also listed on the account does not alter the officers' reasonable belief that this was defendant's residence. See e.g., United States v. Thompson, 402 Fed.Appx. 378, 2010 WL 4780336 (10th Cir. 2010); Valdez v. McPheters, 172 F.3d 1220, 1226 (10th Cir. 1999) (the rule of Payton applies so long as the

further supported a reasonable belief that defendant could be found within the residence at the time of entry. These facts included: defendant was listed as the primary account holder for this residence; Bansemer's investigation had shown no other residence for defendant; information that defendant lacked any gainful employment; the early morning hour of the entry; the indication from the electric meter that someone was currently inside the house; the fact that defendant and Ms. Miller both had warrants for their arrest; the footprints in the snow indicating recent activity at the house; the absence of any evidence that defendant had departed the residence that morning; and the failure of anyone to answer the door despite the likelihood that someone was inside. Cf. Valdez v. McPheters, 172 F.3d 1220, 1226 (10th Cir. 1999) (defendant's fugitive status, the time of day, and the circumstances of defendant's employment were among the factors to be considered); United States v. Woods, 560 F.2d 660, 665 (5th Cir. 1977), cert. denied, 435 U.S. 906 (1978) (reasonable to anticipate that suspect would be "at his place of abode, especially at 8:30 in the morning for a man not known to be working"); El Bey v. Roop, 530 F.3d 407, 418 (6th Cir. 2008) ("His fugitive status also increased the likelihood that he might be at home during business hours, whereas most people would probably be at work on a weekday afternoon."). Although by no means conclusive, the circumstances were sufficient to support a reasonable belief that defendant would be found within the residence at the time of entry.

The court further finds that Deputy Moff's subsequent visual

---

suspect possesses common authority over the residence entered).

search of the bedroom closet, during which he saw two firearms, was part of a legitimate protective sweep. A protective sweep "is a quick and limited search of premises, incident to arrest and conducted to protect the safety of police officers and others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990). It may last no longer than necessary to dispel the reasonable suspicion of danger and to complete the arrest and depart the premises. The additional intrusion from such a search is justified by the interest of the officers in assuring themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The Fourth Amendment permits a protective sweep if officers have a reasonable belief, based on specific articulable facts, that the area to be swept harbors an individual posing a danger to those on the arrest scene. Buie, 494 U.S. at 334-37.

The officers here had a reasonable belief at the time of defendant's arrest that other persons posing a danger to them could be found in the house. The officers had information that defendant, who himself had a history of violent offenses, was a member of a local street gang. They had information that Ms. Miller was a resident of the house and that she also had a warrant out for her arrest. The concern that she or some other potential threat was present in the house could not be dispelled without a brief look through the rooms of the house. Within a minute or two of locating and securing the defendant, Moff looked into the bedroom closet to see if anyone was in it. The closet was clearly big enough that a person could hide in

it. The court finds that this visual inspection for other persons was incident to defendant's arrest and was done in a quick and limited fashion in accordance with Buie. Contrary to defendant's suggestion that a protective sweep could not take place once he had been handcuffed and placed on a couch (Doc. 21 at 6), a protective sweep does not become unlawful the instant a suspect is effectively restrained. Buie itself involved a search after a suspect emerged from a basement and was taken into custody. Buie, 494 U.S. at 328. Buie recognized that officers making an in-home arrest are at a disadvantage and that "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." Arresting officers are "permitted in such circumstances to take reasonable steps to ensure their safety after, and while making, the arrest." Buie, 494 U.S. at 334. This sweep within one to two minutes of defendant's apprehension was reasonable under the circumstances.

Once the officer saw the firearms, he was entitled to seize them under the plain view doctrine, which allows the seizure of evidence without a warrant if: (1) the officer was lawfully in a position from which he saw the object in plain view; (2) the object's incriminating character was immediately apparent (i.e., there was probable cause to believe it was contraband or evidence of a crime); and (3) the officer had a lawful right of access to the object. United States v. Thomas, 372 F.3d 1173, 1178(10th Cir. 2004).

Moff was lawfully present conducting a protective sweep when he saw the firearms in plain view in the closet. The officers knew at that point that defendant was a convicted felon, and the totality of

-9-

circumstances gave rise to probable cause to believe he was in constructive possession of the firearms, making them evidence of a crime. See e.g., United States v. Luke, 686 F.3d 600, 605 (8th Cir. 2012) (incriminating character of ammunition box in truck was immediately apparent where officers knew truck owner was a convicted felon). Defendant's suggestion that the officers could not know with certainty whether he or Ms. Miller possessed the weapons is unavailing. All that probable cause requires is a reasonable probability, and the circumstances known to the officers satisfied that standard. The seizure of the firearms was thus reasonable under the Fourth Amendment.

Defendant argues that his statements to Agent Tierney at the jail must be suppressed as the product of an unlawful search. For the reasons stated previously, the court concludes that the officers' arrest of defendant, the search of the closet, and the seizure of the firearms were all reasonable under the Fourth Amendment. The interview was therefore not the product of any unlawful action. Moreover, the evidence showed that defendant knowingly and voluntarily waived his Miranda rights and voluntarily gave a statement and he did not contend otherwise during his testimony.

Lastly, defendant's supplemental brief addresses the scope of the "special needs" parole exception to the warrant and probable cause requirements. He argues the exception does not justify the search of his residence. (Doc. 21 at 1-3) (citing inter alia United States v.

Mabry, ___ F.3d ___, 2013 WL 4734083 (10th Cir., Sept. 4, 2013).[6] Inasmuch as the government has not asserted or relied upon the parole search exception, the court need not address its possible application under the facts of this case.

**III. Conclusion.**

Defendant's Motion to Suppress (Doc. 13) is DENIED.

IT IS SO ORDERED.

Dated this 10th day of September 2013, at Wichita, Kansas.

s/Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE

---

[6] At the time of his parole, defendant signed a form acknowledging several conditions of release, including that he be subjected to a search of his person or residence by parole officers or designated law enforcement officers. Under Kansas law such a search requires reasonable suspicion. See United States v. Freeman, 479 F.3d 743 (10th Cir. 2007). A search based on the special need of the State to supervise parolees also rests on the relationship between the parolee and the parole officer, and thus does not extend to other law enforcement officers unless they are acting under the direction of the parole officer.

-11-